## BARTOS v. UNITED STATES DISTRICT COURT FOR DISTRICT OF NEBRASKA et al.

Circuit Court of Appeals, Eighth Circuit.
May 17, 1927.

No. 7561.

**1. Attorney and client ⬦39—Attorney's manufacture of beer for use of his family and guests held not offense involving "moral turpitude," and disbarment for three years not warranted.**

Attorney's manufacture of 700 quarts of beer in his home, for use of himself and family and guests, but not for sale, though constituting a violation of National Prohibition Act (Comp. St. § 10138¼ et seq.), *held* not an offense involving moral turpitude, and his disbarment for three years therefor was not justified; "moral turpitude" being restricted to gravest offenses, consisting of felonies, infamous crimes, and those that are malum in se and disclose a depraved mind (citing Words and Phrases, "Moral Turpitude").

**2. Attorney and client ⬦14—Attorney, by his admission to practice in federal courts, becomes officer thereof, holding office during good behavior.**

Attorney, by his admission to practice law in the United States courts, becomes an officer thereof, holding his office during good behavior.

**3. Attorney and client ⬦38—Attorney can be deprived of right to appear for suitors at the bar only by judgment of court for moral or professional delinquency.**

Though the right of an attorney to appear for suitors at the bar is not an absolute one,

it is more than a mere indulgence, revocable at the pleasure of the court, or at the command of the Legislature; it is a right of which he can only be deprived by the judgment of the court for moral or professional delinquency.

**4. Attorney and client ⊗═38—Attorney intentionally violating law or federal Constitution, or impeding justice is guilty of "professional misconduct."**

As an officer of the court, an attorney is under obligation not to intentionally be a lawbreaker, impede the administration of justice, violate the Constitution of the United States, bring the court of which he is an officer into disrepute, nor to hinder the enforcement of the law or popularize the breach thereof, and if he does these things he is guilty of "professional misconduct," even though his acts be not misdemeanors involving moral turpitude.

**5. Attorney and client ⊗═45—Attorney's misconduct outside his professional dealings may justify disbarment.**

The misconduct of an attorney outside of his professional dealings may be such as to justify his disbarment.

**6. Attorney and client ⊗═38—Attorney's manufacture of beer for use of his family and guests held misconduct as officer of court; "professional misconduct."**

Attorney's making of beer for use of himself, his family, and guests, and not for sale, in violation of National Prohibition Act (Comp. St. § 10138¼ et seq.) and of his oath of office and his duty as an officer of the court, was not merely a private affair, apart from his professional duties, but constituted misconduct as an officer of the court.

**7. Attorney and client ⊗═38—Attorney intentionally, knowingly, willfully, and persistently violating federal Constitution, is not proper person to practice law in federal courts.**

Where an attorney intentionally, knowingly, willfully, and persistently violates the Constitution of the United States, he is not a proper person to practice law in the federal courts.

**8. Attorney and client ⊗═54—Court has discretion to discipline an officer thereof for act tending to bring court into disrepute, and, if discipline involves attorney's suspension from practice, he is entitled to hearing and judgment.**

Though the discipline of an attorney generally proceeds on theory that he is not a fit person to further occupy position, it is within sound discretion of court to discipline an officer thereof, whether an attorney or otherwise, for an act tending to bring court into disrepute, and to make such discipline a warning to others not to trifle with the duties imposed on attorney as an officer of the court, and if that discipline involves taking from attorney for a limited period the right to practice at the bar of the court he is entitled to a judgment of the court, but court's discretion is not to be exercised lightly or arbitrarily.

**9. Attorney and client ⊗═58—Suspension of attorney from practice for three years for manufacturing beer for his family and guests held abuse of discretion, in view of his uncontradicted testimony that he believed he was not violating law.**

Suspension of attorney from practice of law for three years for manufacturing 700 quarts of beer in his own home, for use of himself and family and guests, in violation of National Prohibition Act (Comp. St. § 10138¼ et seq.), *held* abuse of discretion, and reprimand would have been sufficient, where attorney's testimony that he manufactured beer on being informed by government prohibition enforcement officers that they were not enforcing the law relative to persons having liquor in their own homes for their own use, and that he therefore believed he did not violate any law, was uncontradicted.

**10. Evidence ⊗═48—It is common knowledge that many prohibition officers have given public to understand that light beer could be manufactured in homes without legal interference.**

It is common knowledge that, whether acting on direct instructions from their superiors or not, many prohibition enforcement officers have given the public to understand that light beer could be manufactured in the home for consumption there, and that there would be no interference therewith.

In Error to the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

In the matter of the disbarment proceedings against Frank W. Bartos. Respondent disbarred for three years (13 F.[2d] 138), and he brings error. Reversed, with direction.

Leonard A. Flansburg and Herbert W. Baird, both of Lincoln, Neb., for plaintiff in error.

Don W. Stewart, of Lincoln, Neb. (Lester C. Dibble, of Lincoln, Neb., on the brief), for defendants in error.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

LEWIS, Circuit Judge. The plaintiff in error pleaded guilty to the charge of making beer in his home for the use of himself and family. When guests were present they were offered a glass and it was usually served in this way at meals, and only in his home. There were no sales, no traffic of any kind. On his plea punishment was imposed. He was a member of the Bar in good standing and had a substantial practice in both Federal and State courts. Having suffered the punishment imposed, he was cited to show cause why he should not be disbarred from practice in the United States District Court for the District of Nebraska; and after a

hearing the court, on the facts stated, disbarred him for a period of three years. No claim was made that he had ever been guilty of malpractice or unprofessional conduct, or that he had ever been accused or charged with any other offense.

The learned District Judge based his order of disbarment on two grounds, as appears in a written opinion which is found in 13 F.(2d) 138: First, the commission of the offense charged involved moral turpitude; and, second, it was a violation of the oath taken on admission to practice,—to support the Constitution and laws of the United States. Both grounds are challenged here. If either ground is well taken the order should be affirmed, but if both are untenable it should be reversed and vacated.

We take it to be a sound principle that the court has no regulatory power over the private life of members of the Bar, and that it cannot exclude them from practice for acts in that capacity unless they be such as to clearly demonstrate their unfitness to longer enjoy the privileges of the profession. Neither ground on which the order was made has any tendency to show malpractice or unprofessional conduct on the part of Bartos; nor was it found, nor is it expressly claimed here, that his act is convincing or persuasive that he will be derelict in duty to the court, to clients or to other members of the Bar. His future dereliction is implicated from the grounds on which the order was made.

[1] It was not a felony (Criminal Code, § 335 [Comp. St. § 10509.]), and hence not infamous. Nor was the act malum in se, but malum prohibitum; and yet it is found that its commission involved moral turpitude. This is an old phrase in the law, and its meaning is demonstrated in cases in which a prior conviction is attempted to be proven for the purpose of impeaching a witness. It is subjective in meaning and restricted to those who commit the gravest offenses,—felonies, infamous crimes, those that are malum in se. They disclose the inherent character, that he is of depraved mind, and because thereof he is not worthy of belief even under oath. Crimes of a heinous nature have always been considered by laymen and lawyers alike as involving moral turpitude, regardless of legislative action on the subject. A thief is a debased man, he has no moral character. The fact that a statute may classify his acts as grand and petit larceny, and not punish the latter with imprisonment and declare it to be only a misdemeanor, does not destroy the fact that theft, whether it be grand or petit larceny involves moral turpitude. It is malum in se, and so the consensus of opinion—statute or no statute—deduces from the commission of crimes malum in se the conclusion that the perpetrator is depraved in mind and is without moral character, because, forsooth, his very act involves moral turpitude. Ex parte Wilson, 114 U. S. 417, 5 S. Ct. 935, 29 L. Ed. 89; In re Kirby (D. C.) 84 F. 606; Glover v. United States (C. C. A.) 147 F. 426, 429, 430, 8 Ann. Cas. 1184; Neal v. United States (C. C. A.) 1 F.(2d) 637; Haussener v. United States (C. C. A.) 4 F.(2d) 884, 887; Williams v. United States (C. C. A.) 3 F.(2d) 129. In State v. Taylor, 98 Mo. 240, 244, 11 S. W. 570, 571, it is said:

"The general moral character of one who has been convicted of an infamous crime may well be considered so degraded as that but little credit ought to be given to his testimony, but it is not necessarily so of one who has been convicted of a mere misdemeanor, or the violation of a city ordinance. * * * Conviction of an infamous crime tends to show a depraved and corrupt nature, a bad general moral character. Conviction of a penal offense not infamous may be consistent with a character generally good or bad."

In that case it was held error to admit in evidence records of convictions for violations of a city ordinance prohibiting frequenting of bawdy houses, for the purpose of impeaching a witness.

In Redway v. Gray, 31 Vt. 292, the slanderous words accused the plaintiff of stealing property of less value than $7.00, and it was contended they were not actionable per se. The court said:

"They impute an infamous crime, involving moral turpitude, * * * the true reason why assaults, and breaches of the peace, and violations of the liquor law are not such offenses as make words charging them actionable, is because they do not necessarily and in a legal sense imply moral turpitude. The offense of larceny does necessarily imply it, and there is no distinction between grand and petit larceny in this respect."

See, also, In re Henry, 15 Idaho, 755, 99 P. 1054, 21 L. R. A. (N. S.) 207. That court again said in McGovern v. Smith, 75 Vt. 104, 53 A. 326:

"The offense of selling intoxicating liquor does not, in a legal sense, involve moral turpitude."

In Spring Co. v. Knowlton, 103 U. S. 49, 26 L. Ed. 347, it was contended that a contract was against public policy, illegal and void. The court, at page 57, said: .

"It is to be observed that the making of the illegal contract was malum prohibitum and not malum in se. There is no moral turpitude in such a contract."

The same principle is restated in Parkersburg v. Brown, 106 U. S. 487, 503, 1 S. Ct. 442, 27 L. Ed 238. In Fort v. City of Brinkley, 87 Ark. 400, 112 S. W. 1084, a physician was convicted of unlawfully selling intoxicating liquors. An Arkansas statute provided that whenever a physician is convicted of an offense involving moral turpitude his license to practice medicine and surgery shall be revoked as an additional penalty. The court entered the order of revocation and Fort appealed. The Supreme court quoted from Black on Intoxicating Liquors, as follows:

"Offenses against the liquor laws, such as illegal sales of intoxicants, keeping liquor in possession with the intent to dispose of it unlawfully, illegally transporting liquor from place to place, and the like, are statutory crimes, not being punishable at common law. They are also of the description mala prohibita, as there is no inherent immorality in such acts, and their illegality lies only in the fact of their being positively prohibited."

And then, after quoting the definition of the phrase: "Moral turpitude is defined to be an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellowmen or to society in general," the court said:

"Moral turpitude implies something immoral in itself, regardless of the fact whether it is punishable by law. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude."

The trial court in its opinion cites a number of cases, not noted above, in which it was held that violations of prohibitory liquor laws do not involve moral turpitude, hence convictions therefor could not be shown for the purpose of impeaching a witness. But it seemed to give much weight to a line of cases, sporadic and unsound we think, which say that the phrase moral turpitude has no definite meaning, that it shifts and fluctuates in keeping with changes in the moral standards of a people or country. This is doubtless so when viewed solely as a question of morals and long periods of time are taken into consideration. But when private rights are being adjudicated they are determined by rules of the civil law, not the moral; and so the civil law fixes a definite meaning to the phrase. It says the commission of crimes malum in se, infamous offenses and those classed as felonies involve moral turpitude,—none others. The phrase is centuries old, it has a definite meaning. The court in Fort's Case, supra, said:

"It seems clearly deducible from the above-cited authorities that the words 'moral turpitude' had a positive and fixed meaning at common law, and that the illegal sale of intoxicating liquors, not being an offense punishable at common law, does not come within the definition of a crime involving moral turpitude."

The same principle of the civil law, which must guide us, was expressed by Justice Robb in his dissent in Rudolph v. United States, 55 App. D. C. 362, 6 F.(2d) 487, 40 A. L. R. 1042. In that case Rudolph, a retired police officer, had been convicted of a violation of the National Prohibition Act (Comp. St. § 10138¼ et seq.). The majority opinion, in reaching the conclusion that Rudolph's act involved moral turpitude, was forced to cast aside a fundamental differentiation. It contains this:

"We are not much concerned with the distinction sought to be made between crimes malum in se and those which are merely malum prohibitum."

To this Justice Robb convincingly made reply:

"The offense charged against the appellee being merely malum prohibitum, and Congress having specifically declared it to be nothing more than a mere misdemeanor, and fixed a penalty as for a misdemeanor, I do not think it is for this Court to give to the offense a classification inconsistent with that evidently intended by Congress. Had Congress intended a violation of the Volstead Act to be within the class of crimes involving moral turpitude, it would have affixed a penalty commensurate with such intent; but it adopted exactly the opposite course."

When this rule of the civil law as distinguished from the moral, is ignored, the court, perhaps unconsciously, sets itself up to enforce what it conceives to be the rule of the moral law, as to which it is without power, and as to which there must at all times be different notions by different judges what that law is. The Master made wine in no small quantity for the marriage feast and it was good.

The District Judge cited in support of his conclusions Underwood v. Commonwealth (Ky.) 105 S. W. 151; State v. Johnson, 174 N. C. 345, 93 S. E. 847; In re Callicotte, 57 Mont. 297, 187 P. 1019; State v. Edmunson, 103 Or. 243, 204 P. 619; to which may be added State v. Bieber, 121 Kan. 536, 247 P. 875, in which attorneys charged with violations of liquor laws were disbarred, and in

which the courts said the offenses involved moral turpitude. In addition to what we have already said in criticism of and disagreement with those conclusions, it may be added that those cases were vastly different in facts from the facts in this case. The parties charged were engaged in the traffic, they had made repeated sales and were repeatedly convicted, they were characterized as bootleggers, some of them, and some as maintaining a "blind tiger," one or more was a prosecuting officer whose official duty it was to prosecute such violations, one was a fugitive and had published a criminal libel, and all but one (Bieber) seem to have had that condition of irresponsibility that no client's cause ought to have been entrusted to them. In Bieber's Case there was an able dissent from the majority on the holding that there was moral turpitude, which was the gist of the issue as applied to the charge of possession only.

Speaking on the subject of admission to the bar the court in Ex parte Garland, 4 Wall. 333, 378, 379 (18 L. Ed. 366), said:

"Their admission or their exclusion is not the exercise of a mere ministerial power. It is the exercise of judicial power. * * * It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency."

There is no claim of professional delinquency. It is admitted that Bartos had conducted himself as an honorable member of the Bar for twenty-six years, that the act for which he was disbarred was the first accusation ever brought against him; and for the reasons stated we think that was not a moral delinquency in the eyes of the civil or common law. A reasonable, fair and just rule on this subject is found in In re Jones (Utah) 249 P. 803, 805:

"The rule as stated in 6 C. J. 600, is that an attorney will not be disbarred for misconduct not in his professional capacity unless such conduct is infamous or very gross."

As to the second ground—of course, all men should support and defend the Constitution, National and State, and the laws made pursuant thereto. But we do not conceive that the oath of an attorney imposes any additional obligation on him in that respect when he is acting in his private capacity. His profession necessarily gives him a better understanding of the organic law than others may have, but his oath is an official oath and it binds him only in his official action. When not so engaged he stands on the same plane as other citizens, no higher, no lower, no different in legal rights and obligations.

Many persons holding office under Federal or State constitutions are required to take an oath to support the Constitution of the United States (article 6). It seems plain that this oath, like the oath of an attorney, is obligatory only as to official conduct; that it could not have been and was not intended to have any application to or efficacy over nonofficial conduct and acts of a purely private nature. To contend that the oath required by article 6 of the Constitution is at all obligatory on a member of a State Legislature while acting in his individual capacity in his social, business and private life, seems wholly irrational. We are thus unable to give any weight to the contention that Bartos, in doing the act charged against him broke the obligation of his official oath as an attorney to support the Constitution of the United States.

But there is a broad contention that an attorney owes it to the court, the public and the Bar to be circumspect in his habits and practices in both his professional and private life, so as to not directly or indirectly reflect discredit or criticism on the administration of justice; and that the conduct of Bartos had or conceivably might have this pernicious tendency, therefore, the court acted within its power and did not abuse its discretion in making the order. When it comes to malpractice, or unprofessional conduct, the power of the court over the offending member is conceded. Its purpose is to protect the public, the court and other members of the Bar. But, as we have already pointed out, this is not a case of that kind. The act was in private social life, and not of professional character. The distinction is important; and if the act does not disclose moral turpitude in the perpetrator rendering him unfit to be entrusted with the confidences and duties of the profession, it cannot appropriately be made the basis of disbarment. The inquiry in that kind of a case would be outside the rules of law and in the uncertain field of purely moral obligation, duty, right and character. Ex parte Wall, 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552, presents an extreme and aggravated case on the facts. He was an attorney. The charge against him for disbarment was that he was a member of a mob which took a prisoner from jail and hung him at the court house door. The court found that he participated in a most atrocious murder; and yet, in the majority opinion, which sustained his disbarment, it is said:

"The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official min-

istration of persons unfit to practice in them. Undoubtedly, the power is one that ought always to be exercised with great caution; and ought never to be exercised except in clear cases of misconduct, which affect the standing and character of the party as an attorney."

Notwithstanding the facts in that case, Mr. Justice Field in his dissent, after pointing out the distinction between professional and private acts of an attorney, said:

"To disbar an attorney is to inflict upon him a punishment of the severest character. He is admitted to the bar only after years of study. The profession may be to him the source of great emolument. If possessed of fair learning and ability, he may reasonably expect to receive from his practice an income of several thousand dollars a year,—equal to that derived from a capital of one or more hundred thousand dollars. To disbar him having such a practice is equivalent to depriving him of this capital. It would often entail poverty upon himself and destitution upon his family. Surely the tremendous power of inflicting such a punishment should never be permitted to be exercised unless absolutely necessary to protect the court and the public from one shown by the clearest legal proof to be unfit to be a member of an honorable profession."

We revert to what we said supra, that the court has no regulatory power over the private life of members of the Bar, and cannot exclude them from practice for acts in that capacity unless they be such as to clearly demonstrate their unfitness to longer enjoy the privileges of the profession. In our judgment the act on which the disbarment order was made is wholly insufficient for that purpose. The action of the court will be reversed with direction to vacate the order of disbarment and restore plaintiff in error as a member of the Bar.

KENYON, Circuit Judge (concurring). I concur in the general conclusion announced by Judge LEWIS that the order of disbarment should be set aside, but do not agree with some of the reasons expressed therefor, and as my conclusion is based in part on somewhat different grounds it seems proper to state them.

The trial court filed a written opinion basing its decision upon two propositions, viz.:

First. That the offense with which Bartos was charged and to which he pleaded guilty was a misdemeanor involving moral turpitude.

Second. That the breach of the oath which Bartos took upon admission to the practice in that court obligating him to support the Constitution of the United States and to demean himself uprightly and according to law had been broken by this unlawful manufacture of intoxicating liquor; that said action on his part was not good demeanor, and that his disregard of the oath he had taken to support the Constitution of the United States and the Constitution of Nebraska warranted the order of disbarment for three years.

In expressing his view as to the first ground the Court said: "The weight of authority favors the view that an intentional violation of the National Prohibition Act may be an offense involving moral turpitude. It is not necessary to say that all intentional violations of the act are such offenses, but the deliberate act of unlawfully manufacturing a large quantity of intoxicating liquor for beverage purposes is an act of moral turpitude, when it is done by a leading attorney at the bar, who has had many years of experience in the practice of his profession. It is an act which is not according to good morals, and an act of depravity in the private and social duties which he owes to his fellow-man and to society in general, and is contrary to the accepted and customary rule of right and duty between man and man."

Well-established grounds for disbarment of an attorney are that he has been convicted of a felony or of a misdemeanor which involves moral turpitude. Moral turpitude is a term having a well defined meaning in the law. It is a phrase describing qualities which inhere in certain wrongful acts. 5 Words and Phrases, First Series, p. 4580, refers to it as follows: " 'Moral turpitude' is defined as an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellowman, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." "Turpitude" is defined by Webster as, "Inherent baseness or vileness of principle, words, or actions; shameful wickedness; depravity." In the leading case of Ex parte Wall, 107 U. S. 265, 273, 2 S. Ct. 569, 575, (27 L. Ed. 552), it is said: "If regularly convicted of a felony, an attorney will be struck off the roll as of course, whatever the felony may be, because he is rendered infamous. If convicted of a misdemeanor which imports fraud or dishonesty, the same course will be taken. He will also be struck off the roll for gross malpractice or dishonesty in his profession, or for conduct gravely affecting his professional character." The court

in its opinion quoted from Lord Mansfield as follows: "It is not by way of punishment; but the court in such cases exercise their discretion, whether a man whom they have formerly admitted is a proper person to be continued on the roll or not." See 16 C. J. 58; Gillman v. State, 165 Ala. 135, 51 So. 722; 27 Cyc. 912; Fort v. City of Brinkley, 87 Ark. 400, 112 S. W. 1084.

None of the cases cited by the trial court in its opinion or by the government in its brief is where the offense against the National Prohibition Act consisted of the manufacture in one's own home of intoxicating liquor for the sole purpose of serving it to the family and guests. Almost all of the cases deal with sales. I think no case can be found where the facts are at all similar to those here presented.

The Eighteenth Amendment prohibits the manufacture of intoxicating liquor, as well as the sale. It is a matter of general knowledge, however, that intoxicating liquors are made in many of the homes of the country for the use of the family and guests, and not for sale. That is of course a violation of law —a crime malum prohibitum, not malum in se. If, however, the liquor in the home had been obtained before the passage of the Eighteenth Amendment and the National Prohibition Act it could be kept and there would be no crime in its possession if there for the "personal consumption of the owner thereof and his family residing in such dwelling and of his bona fide guests when entertained by him therein." U. S. Comp. Stat. § 10138½t.

Further, under the National Prohibition Act warrants to search a private dwelling cannot be issued except by the filing of an affidavit that such residence is being used for the sale of intoxicating liquor. Therefore a party having intoxicating liquor in his home is protected under the National Prohibition Act from any search thereof unless there is evidence of sales. The act itself in this respect recognizes some moral distinction between possession of liquor for use in the home, and liquors for sale.

The mere use of liquor in the home has not been generally regarded as involving any element of immorality or moral turpitude. While the manufacture there is a technical violation of the law, the use of it in the home is not condemned by the National Prohibition Act.

The evidence shows Mr. Bartos manufactured the beer in the basement of his home for the use of himself, family and guests. There is no evidence that he ever sold any of it or gave any of it away, and no such claim is made. He was never charged with or convicted of any violation of the Volstead Act up to that time. There is nothing in the record except this affair to impair in any way his standing in the community. The offense of Bartos was possibly the mildest that could be committed under the National Prohibition Act, were it not for the large quantity of beer so made. Save for this, which arouses some suspicion as to the good faith of the evidence that it was for the use of his family and his guests, I do not think it would be claimed that there was moral turpitude, as that term is understood in the law, involved in the act. Of course, seven hundred quarts of beer would indicate considerable capacity on the part of his family, or numerous guests with large capacities, but it is possible that it was to be used over an extended period of time.

The adoption of the Eighteenth Amendment and the National Prohibition Act were brought about by a general public sentiment that the liquor traffic should be abolished and made an outlaw, and that the traffic itself was a moral evil, but can it be said that the general public conviction is that the use of liquor in the home is such a gross and flagrant offense as to evidence baseness and depravity in the private and social duties which a man owes to his fellow man? If not, then how can the manufacture of liquor in the home for such use be so regarded? There is no inherent immorality in the act of Bartos. It was not a trafficking in liquors. It did not reflect upon his honesty or integrity as a citizen. The court evidently considered that the act was not such as to unfit him for practice or make him untrustworthy in handling the business of his clients, as it did not permanently disbar him but only suspended him from his privilege as an attorney in that court for a period of three years. It would avail little to enter into a general discussion or review of the numerous cases which relate to some phases of this matter. I cite for convenience in future reference a number of them (also text-book references) bearing on the question of "moral turpitude" and disbarment of attorneys.[1] I am of the opin-

[1] Ex parte Secombe, 19 How. 9, 15 L. Ed. 565; Bradley v. Fisher, 80 U. S. (13 Wall.) 335, 20 L. Ed. 646; Brede v. Powers, 263 U. S. 4, 44 S. Ct. 8, 68 L. Ed. 132; In re Keegan (C. C.) 31 F. 129; Haussener v. United States (C. C. A.) 4 F.(2d) 884; Rudolph v. United States, 55 App. D. C. 362, 6 F.(2d) 487, 40 A. L. R. 1042; State v. Peck, 88 Conn. 447, 91 A. 274, L. R. A. 1915A, 663, Ann. Cas. 1917B, 227; In re Sanford, 117 Kan. 750, 232 P. 1053; State v. Bieber, 121 Kan. 536, 247 P. 875; In re Jones (Utah) 249 P. 803; Hors-

ion that the act of manufacturing intoxicating liquor in the home for the use of the family and guests and not to be given away or sold does not constitute a misdemeanor involving moral turpitude as that term is used, defined and understood in the law, and with that part of the opinion I am in accord.

The trial court stated one reason for his decision as follows: "In this case there is more than the mere commission of a misdemeanor involving moral turpitude. The oath which attorneys take upon admission to the bar of this court obligates them to support the Constitution of the United States and to demean themselves uprightly and according to law. The oath taken upon admission to the state court also obligates the support of the Constitution of the United States and of the state of Nebraska. The Constitution of Nebraska, as well as the Constitution of the United States, forbade the unlawful manufacture of intoxicating liquor at the time the respondent committed his offense, and laws enacted in pursuance of these constitutional provisions made the manufacture illegal and imposed penalties for the violation. It cannot be called good demeanor by an attorney, nor can he be said to be possessed of the requisite good moral character to continue as a practitioner at the bar, when he both deliberately violates the Constitution and laws of the United States and of his state, and disregards the solemn oaths he has taken to support these constitutions."

It is apparent therefore that the court based its order in part upon the ground that the act of plaintiff in error was bad demeanor on the part of an attorney who had taken an oath to support the Constitutions of the United States and the state of Nebraska and had violated it. This presents a phase of the case based on the relationship to the situation which arises by the status of Bartos as an officer of the court. There are other reasons than conviction of a felony or a misdemeanor involving moral turpitude for suspension or disbarment of attorneys, one of which is professional misconduct, such as be-

ley v. State, 19 Ala. App. 263, 96 So. 937; Underwood v. Commonwealth (Ky.) 105 S. W. 151; Hightower v. State, 73 Tex. Cr. R. 258, 165 S. W. 184; Lotto v. State (Tex. Civ. App.) 208 S. W. 563; In re Disbarment of F. C. Cary, 146 Minn. 80, 177 N. W. 801, 9 A. L. R. 1272; People v. Meyerovitz, 278 Ill. 356, 116 N. E. 189; People ex rel. Chicago Bar Ass'n v. Amos, 246 Ill. 299, 92 N. E. 857, 138 Am. St. Rep. 239; Ex parte Burr, 9 Wheat. 529, 6 L. Ed. 152; Fairfield County Bar ex rel. Fessenden v. Taylor, 60 Conn. 11, 22 A. 441, 13 L. R. A. 767; Pippin v. State, 197 Ala. 613, 73 So. 340; Black on Intoxicating Liquors, sec. 383.

traying the confidence of a client, practicing a fraud upon the court, "and in fact in any conduct which tends to bring reproach upon the legal profession or to alienate the favorable opinion which the public should entertain concerning it." 6 C. J. § 47, p. 588; Wernimont v. State ex rel. Little Rock Bar Ass'n, 101 Ark. 210, 142 S. W. 194, Ann. Cas. 1913D, 1156; Ex parte Ditchburn, 32 Or. 538, 52 P. 694; In re Radford, 168 Mich. 474, 134 N. W. 472; Weeks on Attorneys, §§ 80 and 81. The Circuit Court of Appeals of the Seventh Circuit quite recently called the Bar's attention to the taking of frivolous appeals to delay litigation and suggested that were it continued it would constitute a cause for disbarment in that court.

[2] An attorney by his admission to practice law in the United States courts becomes an officer thereof, holding his office during good behavior. On this subject I quote:

From Ex parte Robinson, 86 U. S. (19 Wall.) 505, 512 (22 L. Ed. 205): "The order of admission is the judgment of the court that they possess the requisite qualifications both in character and learning. They become by such admission officers of the court, and, as said in Ex parte Garland, 'they hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded.'"

From Ex parte Garland, 4 Wall. 333, 378, 379 (18 L. Ed. 366): "Attorneys and counselors are not officers of the United States; they are not elected or appointed in the manner prescribed by the Constitution for the election and appointment of such officers. They are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. * * * Their admission or their exclusion is not the exercise of a mere ministerial power. It is the exercise of judicial power, and has been so held in numerous cases. It was so held by the Court of Appeals of New York in the matter of the application of Cooper for admission. 'Attorneys and counselors,' said that court, 'are not only officers of the court, but officers whose duties relate almost exclusively to proceedings of a judicial nature. And hence their appointment may, with propriety, be intrusted to the courts, and the latter in performing this duty may very justly be considered as engaged in the exercise of their appropriate judicial functions.'"

In Re Niles, 48 How. Prac. (N. Y.) 246, it is held that attorneys and counselors at law should be classified and designated as judi-

cial officers. State v. Edmunson, 103 Or. 243, 204 P. 619; State v. Burr, 19 Neb. 593, 28 N. W. 261; Petition of Board of Law Examiners (Wis.) 210 N. W. 710; United States v. Green (C. C.) 85 F. 857; Weeks on Attorneys, p. 156.

[3, 4] The office of an attorney is one of dignity and power in which fidelity both to the court and to clients is imperative. It carries with it a duty to assist in the administration of justice. The right conferred to appear for suitors at the bar is not an absolute one, although as said in Ex parte Garland, supra, it "is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the Legislature. It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency." As an officer of the court an attorney is under obligation not to intentionally be a law-breaker; not to impede the administration of justice; not to violate the Constitution of the United States; not to bring the court of which he is an officer into disrespect; not to hinder the enforcement of law or popularize the breach thereof. It is a breach of his official duty to intentionally bring reproach upon the legal profession or the court, to alienate favorable public opinion from the court, and when he does these things he is guilty of professional misconduct even though his acts be not misdemeanors involving moral turpitude. The profession of attorney at bar is not merely an instrumentality for making money. There are reciprocal duties and obligations involved.

When Bartos was admitted and enrolled in the United States District Court of Nebraska he took an oath that as an attorney and advocate of the District Court of the United States for that District he would demean himself uprightly and according to law, and that he would support the Constitution of the United States. That oath was not a mere gesture. He became an officer of the court. While every citizen is under obligation to support the Constitution and the laws of the United States, there is a difference between the obligations of an attorney in that respect and of the lay citizen. The attorney is given the right to practice in the court and to charge fees for his services. He stands as an exemplar of lawful conduct in his community. If he willfully violates the Constitution and the laws of his country, which as an officer of the court it is his special duty to support, he brings the administration of law and the courts into disrepute. He likewise fails to maintain the ethical standards of the

bar and tends to bring the profession of the law into public distrust.

Justice Bradley in Ex parte Wall, 107 U. S. 265, 274, 2 S. Ct. 569, 576 (27 L. Ed. 552), says: "Of all classes and professions, the lawyer is most sacredly bound to uphold the laws. He is their sworn servant; and for him, of all men in the world, to repudiate and override the laws, to trample them under foot, and to ignore the very bands of society, argues recreancy to his position and office, and sets a pernicious example to the insubordinate and dangerous elements of the body politic. It manifests a want of fidelity to the system of lawful government which he has sworn to uphold and preserve."

In Bradley v. Fisher, 13 Wall. 335, 355 (20 L. Ed. 646), the court says: "The obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers."

In Planters' Bank v. Hornberger, 4 Cold. (Tenn.) 531, 566, 571, the court said: "An attorney is a man set apart by the law, to expound, to all persons who seek him, the laws of the land, relating to high interest of property, liberty, and life. To this end, he is licensed and permitted to charge for his services."

In People ex rel. Skelton v. Brown, 17 Colo. 431, 30 P. 338, the court said: "When this court grants a license to a person to practice law, the public and every individual coming in contact with the licensee in his professional capacity has a right to expect that he will demean himself with scrupulous propriety as one commissioned to a high and honorable office."

In Bar Association of City of Boston v. Greenhood, 168 Mass. 169, 187, 46 N. E. 568, 576, the court says: "It is important that the oath of office taken by attorneys on admission to the bar should not be considered and treated by those who take it as an empty form. Nothing in the life of the people more deeply concerns their welfare than the administration of justice in our courts. The high standard of integrity which is prescribed by our Constitution and our laws for the officers of our courts should be maintained."

[5-8] The misconduct of an attorney outside of his professional dealings may be such as to justify disbarment. 2 R. C. L. p. 1099, § 192, and cases there cited. A court is under no compulsion to permit a moral leper to appear at its bar, even though there be no ques-

tion raised at all as to professional misconduct. The private character of an attorney at the bar may be such as to render him an unfit person to continue to be a member of such bar. Selling v. Radford, 243 U. S. 46, 37 S. Ct. 377, 61 L. Ed. 585, Ann. Cas. 1917D, 569. However, the act of plaintiff in error in disregarding his oath of office and his duty as an officer of the court was not merely a private affair apart from his professional duties. Nor is it misconduct wholly divorced from his professional capacity. It was misconduct as an officer of the court. Where an attorney at law intentionally, knowingly, willfully, and persistently violates the Constitution of the United States he is not a proper party to practice law in the courts of the United States established by the power of the very Constitution he is violating. He gives notice by such conduct that he will not abide by the Constitution of the United States. If such fact should appear when a party is seeking admission to the bar, he would not be admitted to practice. While the disbarment of an attorney generally proceeds on the theory that he is not a fit man to further occupy the position, yet, it is within the sound judicial discretion of the court to discipline an officer thereof, whether an attorney or otherwise, for an act which tends to bring the court into disrepute, and to make such discipline a warning to others not to trifle with the duties imposed upon an attorney as an officer of the court. If that discipline involves taking from him for a limited period the right to practice at the bar of the court, he is entitled to a hearing thereon and a judgment of the court. The discretion of the court is, of course, not to be exercised lightly or arbitrarily.

In the matter of Francis Blake, 3 Court of the Queen's Bench and Court of Exchequer Chamber, 34, 39, the English court pointed out the duty and the right of a court to punish attorneys as a warning to others. Whether it be by contempt proceedings or striking the name from the rolls for a limited period, the result is the same. Discussing the matter the court there said: "These being the facts, we are bound so to deal with the attorney as to hold his case out as a warning, and to show our vigilance in protecting persons who may have similar dealings with other attorneys. Although, therefore, we shall not take the extreme course of striking him off the roll, we must visit him with a punishment adequate to his offense by suspending his certificate for two years from 28th February last."

[9,10] If the evidence in this record had shown a willful, deliberate, intentional viola-

tion of an amendment to the Constitution of the United States, I should feel the trial court did not abuse its discretion in suspending Bartos for three years from practicing at the bar of that court, although the punishment would seem rather severe. However, the record contains a strong, mitigating circumstance. Bartos testifies, and there is no contradiction thereof, that he was informed by the prohibition enforcement officers of the government that they were not enforcing the part of the law relative to persons who had liquor in their own homes for their own use, and therefore that he did not think he was violating any law at all, because "I always thought that the law was violated only to the extent to which it was enforced." It is a matter of common knowledge that, whether acting on direct instructions from their superiors or not, many of the prohibition enforcement officers have given the public to understand that light beer could be manufactured in the homes for consumption there, and that there would be no interference therewith. The law itself, as I have previously pointed out, draws a distinction between liquor manufactured in the home for use and liquor manufactured for sale; no search warrant being available to search homes where liquor is merely manufactured for home use and not for sale. It seems, therefore, that while Bartos as a lawyer knew his act was a technical violation of the law, his information from prohibition officers led him to the belief that that phase of the law dealing with manufacturing in the home for the use of himself or family was not to be enforced. This circumstance mitigates the offense and it seems to me robs it of any such turpitude as would justify the severe punishment of a suspension from practice for a period of three years. The violation of his oath of office as an attorney was a technical one for which a reprimand of the court would have been sufficient punishment. The severe punishment administered under all the circumstances was in my judgment an abuse of the discretion imposed in the court, and for that reason I concur in the conclusion that the order of disbarment should be set aside.

TRIEBER, District Judge (concurring). I concur in the reversal as announced by Judge LEWIS, but not in all the reasons expressed in his opinion. I fully concur in the concurring opinion of Judge KENYON, and only wish to add to his opinion that it is unnecessary to discuss in this case what constitutes moral turpitude.

In my opinion no person should be en-

rolled as an attorney, who knowingly violates, not only a law of the nation, but also a constitutional provision. A person who commits such an offense is not, in my opinion, a man of such moral character as one desiring to become a member of the legal profession should be, as is so ably stated in the opinion of Judge KENYON.

If, after his admission, his conduct is such that, had it been established when he applied for admission to the bar, the court would have denied his enrollment, it is the duty of the court to revoke it. In People v. Keegan, 18 Colo. 237, 32 P. 424, 36 Am. St. Rep. 274, it was said:

"A good moral character is one of the essential requisites to admission to the bar in this state, and the tenure of office thereby conferred is during good behavior; and when it appears, upon full investigation, that an attorney has forfeited his 'good moral character,' it becomes the duty of the court to revoke the authority it gave him upon his admission."

To the same effect see, in addition to the authorities cited by Judge KENYON, Matter of Wool, 36 Mich. 299; State v. McClaugherty, 33 W. Va. 250, 10 S. E. 407; In re Delano, 58 N. H. 5, 42 Am. Rep. 555; People v. Baker, 311 Ill. 66, 142 N. E. 554, 31 A. L. R. 737.

The argument of learned counsel for plaintiff in error that, this constitutional amendment and the National Prohibition Act, enacted to carry this amendment to the Constitution into effect, is being violated by men of high standing in their respective communities, is no excuse. It is deplorable that this is a fact, and unfortunate that such violators are not as frequently punished as they should be. But the prohibition law is not the only law which is being violated by these men. The laws against gambling, carrying concealed weapons, and more serious laws are violated daily; but shall, for that reason, violators when brought to the bar of justice be left unpunished?

The manufacture and sale of intoxicating liquors has, long before the enactment of the prohibition laws, been considered immoral, and many of the secret societies, such as Masons, Odd Fellows, Knights of Pythias, and similar organizations, have denied them admission long before the adoption of the Eighteenth Amendment and the National Prohibition Act. Should members of the legal profession adopt a lower standard of morality than these organizations?

My reasons for concurring in a reversal are that the evidence does not show an intentional violation of the law by Mr. Bartos. Some of the prohibition enforcement officers had publicly stated that the manufacture of beer for one's use, although containing a prohibited amount of alcohol, was not a violation of the law, and many newspapers published statements to the same effect. This, as the evidence establishes, caused Mr. Bartos to manufacture the beer, in the honest belief that he did not violate the law by making the beer for his own use and his guests.

I believe, as stated by Judge KENYON in his concurring opinion, a reprimand would have been a sufficient punishment upon the facts in the case.