## No. 12,548.

PEOPLE EX REL. COLORADO BAR ASSOCIATION *v*. HILLYER.
(297 Pac. 1004)

Decided March 9, 1931. Rehearing denied April 13, 1931.

Mr. Robert E. Winbourn, Attorney General, Mr. Clarence L. Ireland, Attorney General, Mr. Charles Roach, Deputy, Mr. Oliver Dean, Assistant, Mr. Harry S. Silverstein, for petitioner.

Mr. Charles S. Thomas, Mr. George K. Thomas, Mr. Fred A. Sabin, for respondent.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

In 1929 and 1930 the committee on grievances of the Colorado Bar Association, which committee, by our rules 84h and 84i, is made an agency of this court for such purpose, investigated certain charges against Granby Hillyer, a member of the bar. As a result of such investigation, a petition was filed on January 27, 1930, by the Attorney General, upon the relation of that association, asking that the respondent be disbarred or otherwise disciplined. An answer was filed and a referee was appointed, who, after a hearing, made a report to this court.

The petition contains four charges of misconduct on the part of the respondent. The referee found that the fourth was not sustained by the evidence, and, after examining the record, we approve that finding.

1. The first charge is that the respondent misappropriated money collected by him for one Gano, a client.

The respondent was employed by Gano, of Hutchinson, Kansas, to collect from the American State Bank of Granada, Colorado, an account of $1,150. A retainer of $100 was paid to the respondent. About May 1, 1926, the full amount of the claim was collected by the respondent, who, instead of sending the money to his client, deposited it to the credit of the respondent's personal account in a Denver bank. Hearing, not from the respondent, but from the American State Bank, that the money

had been paid to the respondent, Gano, on May 11, wrote to the respondent informing him that Gano had heard of the payment, and inquiring why the respondent did not remit to him. Gano also telegraphed the respondent to the same effect. Receiving no answer, Gano, on May 12, sent to the respondent another telegram, in answer to which the respondent telegraphed, "Am writing you with settlement." The respondent sent his personal check for $1,000 to Gano, retaining $150, claiming it as additional compensation for his services. The check was presented for payment, was dishonored by reason of insufficient funds, and was duly protested. The respondent claims that when he drew the check he supposed that his bank balance was sufficient to pay the check. Gano took the matter up with one Maxwell, who had recommended the respondent to him. Maxwell conferred with the respondent and agreed to advance the amount necessary to satisfy the Gano claim and look to the respondent for reimbursement. Maxwell interested another friend, who agreed to advance one-half of the amount required, Maxwell to advance the other half. Laboring under the impression that the amount due was $800, Maxwell, on June 17, 1926, sent his check for $400 to Gano. On October 27, 1926, not having received any further payments, Gano wrote to the respondent, threatening disbarment proceedings unless the matter was promptly cared for. In the early part of December, 1926, Gano, not having received any remittance from Maxwell's friend, who was to advance one-half of the amount, and feeling that it was unfair to Maxwell to have him assume the full burden, returned to Maxwell his remittance of $400. On December 3, 1926, the respondent paid Gano $200 on account, and on June 6, 1927, an additional $200. On October 24, 1927, Maxwell wrote to the respondent, advising him that the respondent still owed Gano $750. On May 19, 1928, Gano also wrote to the respondent with reference to the matter. The respondent explains his inaction by stating that he relied upon Maxwell's agree-

ment to satisfy the Gano claim and did not know that the arrangement had fallen through. In October, 1929, Gano filed charges against the respondent with the grievance committee. Sometime after the hearing before the committee, which was on January 15, 1930, the respondent paid to Gano the balance due him, without deducting the $150 formerly claimed by him as an additional fee.

The evidence sustains the referee's finding that the respondent was guilty of the first offense charged in the petition.

2. The second charge is that the respondent grossly neglected his duty as an attorney for one Rickert in an action against a railroad company for damages for personal injuries sustained by Rickert.

Rickert was injured on July 1, 1925, while in the employ of a railroad company. He made a tentative settlement whereby he accepted $700 and released the company from further liability provided he was able to resume his duties within six months. Claiming that he was not able to resume his duties within that period of time, he opened up negotiations with the company for a further settlement. The company offered to pay him $1,500 in full settlement of his claim, which offer Rickert refused to accept. He and the company's claim agent continued negotiations for a settlement until after July 1, 1927, when the claim agent informed him that the two-year statute of limitations had barred his claim and that the company would pay him nothing. Thereafter Rickert employed the respondent to sue the railroad company. The respondent informed Rickert that the case was a difficult one because of the prior settlement and the running of the statute of limitations, but that Rickert had a "fighting chance." The action for damages was commenced in the state court on April 5, 1928, and thereafter was removed to the federal court. In its answer the company pleaded the settlement and the statute of limitations as defenses to the action. The answer reached the office of the respondent while he was engaged in the lengthy

trial of a complicated case. He failed to file a replication. The railroad company filed a motion for judgment on the pleadings, which motion was sent to the respondent's office. On September 24, 1928, the motion was heard, the respondent failing to appear. The motion was granted, the case dismissed and judgment entered against Rickert for costs amounting to $38.65. The dismissal of the action first came to Rickert's attention when the railroad company's attorney wrote him a letter requesting payment of the judgment. Rickert thereupon interviewed the respondent, who advised him that he would attempt to have the case reinstated and, if he was unsuccessful, that he would appeal to the circuit court of appeals. Thereupon Rickert paid the respondent $57 to defray the costs of the contemplated appeal. The court did not allow the reinstatement of the case, and when the respondent later presented his assignment of errors and an appeal bond, the court refused to allow the appeal on the ground that it was frivolous. The respondent concluded to commence a new action. A new complaint was prepared, verified by Rickert, and entrusted by the respondent to another lawyer, who had assisted him in the case and whom he engaged to file the new complaint. Thereafter the respondent was almost continuously out of the city. The new complaint was never filed. Rickert claimed damages against the respondent for the negligent handling of the case, and after complaint was made to the grievance committee the respondent paid Rickert $600 in full settlement of the demand. The respondent says that the settlement was agreed to by him before he knew that Rickert made any complaint to the grievance committee concerning the matter.

The referee found that the respondent was guilty of the offense charged in the petition, and the evidence supports the finding.

3. The third charge is that the respondent converted to his own use money that one Barnhill, a client, had

entrusted to him for the express purpose of redeeming certain mining properties from tax sales.

The wife of Barnhill owned the tax title to the properties. While she thus owned the property, there were subsequent sales for non-payment of taxes. Barnhill was heavily indebted to the respondent for moneys loaned to Barnhill and for moneys paid for his benefit, and had agreed to pay him $1,000 on account. In October, 1927, Barnhill, then in Cedar Rapids, Iowa, telegraphed to the respondent the sum of $1,462, with instructions to apply $100 on account of Barnhill's indebtedness to the respondent, and to use the balance, $1,362, to redeem from the tax sales the mining properties referred to above. Instead of obeying instructions, the respondent applied only $437 to the redemption of the properties, and applied the balance, $1,025, on the indebtedness due him. The respondent testified: "I redeemed the taxes that I thought were pressing and let the other go. * * * I undoubtedly would not have taken any of the money, no matter how much he owed me, except that I really did need it, and * * * if I had gotten in funds between then and before we had this break up, I probably would have taken this tax certificate down, too. * * * I am not trying to make any excuses, I am trying to give you the facts. I suppose it was a trust fund, but I never thought of doing business with Barnhill on any strict sense. It had been loosely done, and I had been a loser, and I was a loser, and I am a loser. That was Barnhill's money." Later in 1927 the respondent explained the situation to Barnhill, and Barnhill approved of the respondent's application of the money. Mrs. Barnhill, in whose name the title stood, made no objection at any time, although her title to the properties was lost because of the failure to redeem. She testified in favor of the respondent at the hearing before the referee. Among other things, she said: "Every parcel of money that Mr. Barnhill ever sent, when he sent it to Mr. Hillyer, part of it Mr. Hillyer was supposed to use it for himself, for what

Mr. Barnhill owed him. Mr. Hillyer gave us money to eat on; he put clothes on Mr. Barnhill so he could make a decent appearance; for months, not weeks, he fed us, * * * both of us.''

The evidence sustains the finding of the referee that the respondent was guilty of the third offense charged in the petition. The respondent admits that he misappropriated trust funds. The referee could have made no other finding.

4. The belated payments to Gano can be considered only in mitigation, and its force as such is greatly weakened by the circumstances. He paid nothing until Gano threatened disbarment proceedings. More than one month thereafter he paid $200, and over seven months after such threat he paid another $200. He did not pay the balance until over three years and eight months after collecting the account, and not then until after the conclusion of the hearing of the Gano complaint by the grievance committee. It seems, therefore, that the respondent misappropriated the money of his client, Gano, and made restitution only when threatened with disbarment.

5. The circumstances surrounding the respondent's neglect of the Rickert case were such that, if this charge stood alone, perhaps a reprimand and a warning would suffice. But it does not stand alone. It must be considered in connection with the other charges.

6. That the respondent converted to his own use money sent to him by his client, Barnhill, for the purpose of redeeming certain mining properties from tax sales, stands admitted. Before using the trust fund for his own purposes, he should have telegraphed or written his client and obtained permission to do so. This he did not do. True, sometime later his client ratified his act. The only effect of that was to relieve the respondent from liability to Barnhill. For some purposes ratification is equivalent, in law, to antecedent authority, but that principle has no application in a disbarment proceeding. Ratification cannot affect the moral character of the act of

misappropriation, and the moral character of the act is the all-important consideration in a disbarment proceeding. In considering an attorney's moral fitness to be a member of the bar, we must consider the character of his act at the time it was committed. If it was improper and immoral at that time, it does not become proper and moral by reason of a subsequent forgiveness by the victim. In *People v. Patterson,* 56 Colo. 296, 138 Pac. 30, we disbarred an attorney notwithstanding the request of the complaining party that the proceeding before the grievance committee be discontinued, his claim against the attorney having been settled. However, in view of the relations that existed between the respondent and the Barnhills, their manner of doing business together, the ratification by Barnhill, and the attitude of Mrs. Barnhill, we would feel disposed, if this charge stood alone, to take the view that something less drastic than disbarment would serve the ends of justice. But, as we said with reference to the Rickert charge, it does not stand alone, but must be considered in connection with the other charges.

7. In *People v. Brown,* 17 Colo. 431, 435, 30 Pac. 338, we said: "When this court grants a license to a person to practice law, the public and every individual coming in contact with the licensee in his professional capacity has [have] a right to expect that he will demean himself with scrupulous propriety as one commissioned to a high and honorable office. A person enjoying the rights and privileges of an attorney and counselor at law must also respect the duties and obligations of the position."

8. A consideration of the entire record impels us to the conclusion that the conduct of the respondent has been such as to impose upon us the duty of revoking his license to practice law in this state.

The license of the respondent to practice law is revoked, his name is stricken from the roll, and he is debarred from further practicing law in this state.

436

Mr. Justice Moore agrees with the findings of the referee and the opinion, but feels, under all the circumstances disclosed by the record, that the judgment of disbarment is too severe.

Mr. Justice Campbell and Mr. Justice Hilliard did not participate.